**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **RICHARD ALMEDA** individually and on behalf of all others similarly situated, *Plaintiff*, | Case No. |
| vs. | **CLASS ACTION COMPLAINT** |
| **VERISOURCE SERVICES, INC.** *Defendant*. | **DEMAND FOR JURY TRIAL** |

**PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT**

Plaintiff, Richard Almeda ("Plaintiff") brings this Class Action Complaint ("Complaint") against VeriSource Services, Inc., ("VeriSource" or "Defendant"), for its failure to properly secure and safeguard Plaintiff's and Class Members' protected personally identifiable information stored within Defendant's information network, including without limitation, names, date of birth, gender, and/or Social Security numbers, (these types of information, *inter alia*, being thereafter referred to, collectively, as "personally identifiable information" or "PII ").

Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of counsel, and facts that are a matter of public record.

**INTRODUCTION**

1. This is a civil action seeking monetary damages and injunctive and declaratory relief from Defendant, VeriSource.

2. Plaintiff further seeks to hold Defendant responsible for not ensuring that the PII was maintained in a manner consistent with industry standards.

3. Defendant is an employee benefits administration service provider.

4. On February 28, 2024, VeriSource became aware of suspicious activity when it experienced disruption to access across several systems.

5. Based on a subsequent forensic investigation, VeriSource determined that cybercriminals infiltrated its inadequately secured computer environment and thereby gained access to its data files (the "Data Breach").

6. According to VeriSource, the personal information accessed by cybercriminals involved a wide variety of PII, including names, dates of birth, Social Security numbers, gender information, and addresses.[1]

7. Although VerisSource initially reported the breach as affecting 1,382 individuals,[2] its recent notification to the Maine Attorney General on April 17, 2025 reports a staggering ***four million*** people affected by the Data Breach.[3]

8. To date, Defendant has provided almost no information regarding the Data Breach, how it occurred, or what vulnerabilities the hackers exploited. Based on the notice letter[4] received by Plaintiff, the type of cyberattack involved, and public news reports, it is plausible and likely that Plaintiff's Personal Information was stolen in the Data Breach.

9. Defendants' purported disclosure amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

10. To make matters worse, Defendant waited nearly ***fourteen months*** after the Data Breach occurred to notify Plaintiff and Class Members that the sensitive PII they entrusted to Defendant is now in criminal hackers' possession. This unreasonable and unexplained delay

---

[1] https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

[2] Steve Alder, *Verisource Services Increases Data Breach Victim Count to 4 Million*, The HIPAA Journal (April 29, 2025) https://www.hipaajournal.com/verisource-services-data-breach/.

[3] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/c3b01c74-3b74-4899-8da9-e024afedbe12.html/

[4] Plaintiff's Notice Letter, attached as **Exhibit A**.

deprived Plaintiffs and Class Members of crucial time to address and mitigate the heightened risk of identity theft and other harms resulting from the Data Breach.

11. Nevertheless, it is clear that Defendant failed in its obligations to reasonably protect the PII in its possession because the hackers were able to peruse Defendant's information systems, including to perform noisy tasks such as reconnaissance operations to locate the valuable files and exfiltrate them. These operations should have been identified if Defendant had implemented reasonable monitoring and alerting tools. Moreover, by virtue of the notifications themselves, Defendant did not encrypt or mask the PII in its system, as no notice would have been required if the data had been encrypted or masked.

12. As explained below, Plaintiff and Members of the Class have suffered significant injury and damages due to the Data Breach permitted to occur by VeriSource, including monetary damages including out-of-pocket expenses, including those associated with the reasonable mitigation measures they were forced to employ, and other damages. Plaintiff and the Class also now forever face an amplified risk of misuse, fraud, and identity theft due to their sensitive Personal Information falling into the hands of cybercriminals because of the tortious conduct of Defendant.

## PARTIES

13. Plaintiff is, and at all times mentioned herein, an individual citizen residing in Roseville, California.

14. Plaintiff understandably and reasonably believed and trusted that Plaintiff's Private Information provided to Defendant would be kept confidential and secure and would be used only for authorized purposes.

15. Defendant is a corporation organized under the laws of Texas with its principal place of business in Houston, Texas: 7600 West Tidwell Road, Ste. 700, Houston TX 77040 – 5794. Its registered agent for service of process is: Kathleen J. Lee, 7600 West Tidwell Road, Ste. 700, Houston TX 77040 – 5794.

## JURISDICTION & VENUE

16. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because Plaintiff and at least one member of the Class is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

17. Because Plaintiff and Defendant are citizens of different states, § 1332(d)'s minimal diversity requirement is met here.

18. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in this District, Defendant regularly conducts business in this District, and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

19. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant's principal place of business is in this District; a substantial part of the events, acts, and/or omissions giving rise to Plaintiff's claims occurred in this District, and Defendant is at home in this District.

## COMMON FACTUAL ALLEGATIONS

20. The information held by Defendant in its computer systems at the time of the Data Breach included the unencrypted PII of Plaintiff and Class Members.

21. When companies choose to do business with Defendant, it is implicitly understood that Defendant will keep the PII of their customers confidential and will reasonably protect that information with sufficient cybersecurity measures.

22. Defendant had a duty to adopt reasonable measures to protect the PII of Plaintiff and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep its consumers' employees' PII safe and confidential.

23. Defendant had obligations created by the Federal Trade Commission Act, 15 U.S.C. § 45 ("FTCA" or "FTC Act"), industry standards, and implicit representations made to Plaintiff and Class Members, to keep their PII confidential and to protect it from unauthorized access and disclosure.

24. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

**Defendant's Data Breach Was Imminently Foreseeable.**

25. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store PII, like Defendant, preceding the date of the Data Breach.

26. Data thieves regularly target institutions like Defendant due to the sensitive information in their custody. Defendant knew and understood that unprotected PII is valuable and highly sought after by criminal parties who seek to illegally monetize that PII through unauthorized access.

27. In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[5]

28. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable

[5] *See* Identity Theft Res. Ctr., *2021 Data Breach Annual Report*, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s.

consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

29. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the PII of Plaintiff and Class Members from being compromised.

30. Defendant was, or should have been, fully aware of the unique type and the significant volume of data in its systems, amounting to millions of individuals' detailed PII, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

31. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

32. The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

**Value of Personally Identifiable Information.**

33. Identity theft is "a fraud committed or attempted using the identifying information of another person without authority."[6] Indeed, "identifying information" is "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[7]

---

[6] 17 C.F.R. § 248.201 (2013).
[7] *Id.*

34. The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[8]

35. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[9]

36. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[10]

**Defendant Failed to Comply with FTC Guidelines.**

37. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for

---

[8] Anita George, *Your Personal Data Is for Sale on The Dark Web. Here's How Much It Costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs.

[9] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

[10] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. See, e.g., FTC v. Wyndham Worldwide Corp., 799 F.3d 236 (3d Cir. 2015).

38. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

39. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

40. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

41. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security

practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

42. Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTC Act yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with Industry Standards.**

43. Experts studying cybersecurity routinely identify institutions that store PII and like Defendant as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

44. Some industry best practices that should be implemented by institutions dealing with sensitive PII, like Defendant, include, but are not limited to: educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, implementing reasonable systems to identify malicious activity, implementing reasonable governing policies, and limiting which employees can access sensitive data. As evidenced by the Data Breach and its timeline, Defendant failed to follow some or all these industry best practices.

45. Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network

ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points.

46. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

47. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Common Injuries & Damages**

48. Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); and (d) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

**The Data Breach Increases Victims' Risk of Identity Theft.**

49. Plaintiff and Class Members are at a heightened risk of identity theft for years to come, especially because Defendant's failures resulted in Plaintiff's and Class Members' PII falling into the hands of identity thieves.

50. The unencrypted PII of Class Members has already or will end up for sale on the dark web because that is the *modus operandi* of hackers. Indeed, when these criminals do not post the data to the dark web, it is usually at least sold on private Telegram channels to even further identity thieves who purchase the PII for the express purpose of conducting financial fraud and identity theft operations.

51. Further, the standard operating procedure for cybercriminals is to use some data to access "fullz packages" of that person to gain access to the full suite of additional PII and PHI that those cybercriminals have access through other means. Using this technique, identity thieves piece together full pictures of victim's information to perpetrate even more types of attacks.[11]

52. With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

[11] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm.

53. The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

54. In other words, even if Social Security numbers were not included here, the hackers who took the data can use the information gained to cross-reference Fullz lists to obtain access to Class Members' Social Security numbers and pair that information with the data included in the stolen data.

**Loss of Time to Mitigate Risk of Identity Theft and Fraud.**

55. Because of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm and a Defendant arguing that the individual failed to mitigate damages.

56. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions to remedy the harms they have or may experience because of the Data Breach, such as contacting credit bureaus to place freezes on their accounts; changing passwords and re-securing their own computer networks; and checking their financial accounts

and health insurance statements for any indication of fraudulent activity, which may take years to detect.

57. These efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[12]

58. These efforts are also consistent with the steps that FTC recommends that data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[13]

**The Future Cost of Credit and Identity Theft Monitoring Is Reasonable and Necessary.**

59. Based on the value of the information stolen, the data either has or will be sold to even further cybercriminals whose mission it is to perpetrate identity theft and fraud—even apart from the cybercriminals and identity thieves that stole the data in the first instance. Even if the data is not posted online, these data are ordinarily sold and transferred through private Telegram channels wherein thousands of cybercriminals participate in a market for such data so that they can misuse it and earn money from financial fraud and identity theft of data breach victims.

---

[12] *See* U.S. Gov't Office, GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

[13] *See* Fed. Trade Comm'n, *Identity Theft.gov*, https://www.identitytheft.gov/Steps.

60. Such fraud may go undetected for years; consequently, Plaintiff and Class Members are at a present and continuous risk of fraud and identity theft for many years into the future.

61. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more per year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of seven years that Plaintiff and Class Members would not need to bear but for Defendant's failure to safeguard their PII.

**Plaintiff's Experience.**

62. Plaintiff provided his PII to his employer, who then conveyed it to Defendant as a condition of receiving insurance services.

63. Defendant admitted via its notification letter to Plaintiff that his information was included in the Data Breach, including his Social Security number. Exhibit A, Notice of Security Incident.

64. Because of the Data Breach, Plaintiff has spent time going through his account statements and credit history to identify malicious activity, as Defendant instructed him to do in its notification letter.

65. Moreover, because of the highly sensitive nature of the PII, including Plaintiff's Social Security number, the Data Breach represents a brazen invasion of privacy—a harm long recognized by American courts.

66. Further, Plaintiff has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of the very people whose mission it is to use that data to steal Plaintiff's identity and to attempt financial fraud. Indeed, Plaintiff and the Class face years of substantial risk of identity

theft and fraud because of Defendant's failures and through no fault of their own. Defendant brought this harm to their doorstep.

67. Because of the seriousness of the data at issue here, Plaintiff has suffered stress and anxiety because of the invasion of his privacy and because of the significance of the harm he now faces from identity theft and fraud.

## CLASS ALLEGATIONS

68. Plaintiff brings this action on behalf of himself and on behalf of all members of the proposed class defined as:

All individuals whose PII was compromised in the Data Breach ("Class").

69. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

70. Plaintiff reserves the right to amend the definition of the proposed Class or to add a subclass before the Court determines whether certification is appropriate.

71. *Numerosity:* The Class is so numerous that joinder of all Members is impracticable. The number of class members is reported by Defendant to be in the millions. The identity of these individuals are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. Defendant has the administrative capability through its computer systems and other records to identify all Class Members, and such specific information is not otherwise available to Plaintiff.

72. *Commonality and Predominance:* There are numerous questions of law and fact common to the Class. As such, there is a well-defined community of interest among the Class Members. These questions predominate over questions that may affect only individual Class Members because Defendant has acted on grounds generally applicable to the Class. Such common legal or factual questions include, but are not limited to:

a. Whether Defendant had a contractual duty to protect the PII entrusted to it;

b. Whether Defendant knew or should have known of the susceptibility of its systems to a data breach;

c. Whether Defendant's security measures to protect its systems were reasonable considering best practices recommended by data security experts;

d. Whether Defendant's failure to implement adequate data security measures allowed the Data Breach to occur;

e. Whether Plaintiff and Class Members were injured and suffered damages or other losses because of Defendant's failure to reasonably protect its systems and data network;

f. Whether Plaintiff and Class Members are entitled to relief;

g. Whether Defendant failed to adequately notify Class Members of the compromise of their PII;

h. Whether a contract existing between Plaintiff and the Class Members, and the Defendant, for educational services and data security;

i. Whether Defendant breached its contracts with Class Members by failing to properly safeguard their PII and by failing to notify them of the Data Breach; and,

j. Whether Defendant was unjustly enriched.

73. *Typicality:* Plaintiff's claims are typical of the claims of all Class Members, because all such claims arise from the same set of facts regarding Defendant's failures:

a. to protect Plaintiff's and Class Members' PII;

b. to discover and remediate the security breach of its computer systems more quickly; and;

c. to disclose to Plaintiff and Class Members in a complete and timely manner information concerning the security breach and the theft of their PII.

74. *Adequacy:* Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is a more than adequate representative of the Class in that Plaintiff is a victim of the Data Breach, has suffered injury and damages such as misuse and fraudulent activity because of the Data Breach, and brings the same claims on behalf of himself and the putative Class. Plaintiff has no interests antagonistic to that of the Class Members. Plaintiff has retained counsel who are competent and experienced in litigating class actions, including class actions following data breaches and unauthorized data disclosures. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Class's interests.

75. *Superiority:* It is impracticable to bring Class Members' individual claims before the Court. Class treatment permits many similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

76. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a. The unnamed Class Members are unlikely to have an interest in individually controlling the prosecution of separate actions;

b. Concentrating the litigation of the claims in one forum is desirable; Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

c. Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

77. Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to the Class Members' names and addresses. Using this information, Class Members can be identified and ascertained for the purpose of providing constitutionally sufficient notice. Indeed, Defendant must have this information because it sent notification letters.

## CLAIMS FOR RELIEF

### COUNT I
### NEGLIGENCE AND NEGLIGENCE PER SE
### (On Behalf of Plaintiff and the Class)

78. Plaintiff incorporates the above allegations as if fully set forth herein.

79. Plaintiff and Class Members provided their non-public PII to Defendant as a condition of receiving insurance services.

80. Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII was wrongfully disclosed.

81. By assuming the responsibility to collect and store this data, Defendant had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

82. Defendant had duties to employ reasonable security measures under Section 5 of the FTCA, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

83. Defendant's duty to use reasonable security measures also arose under the common law, and as informed by the FTC Act, which mandates that Defendant implement reasonable cybersecurity measures.

84. Given the foreseeability of data breaches, Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

85. Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and Class Members of the Data Breach.

86. Defendant had and continues to have duties to adequately disclose that the PII of Plaintiff and Class Members within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice is necessary to allow Plaintiff and Class Members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

87. Moreover, Defendant had a duty to delete Plaintiff's PII once it was no longer needed.

88. Defendant breached its duties, pursuant to the FTC Act, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited

to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b. Allowing unauthorized access to Class Members' PII;

c. Failing to remove Plaintiff's and Class Members' PII it was no longer required to retain pursuant to regulations; and

d. Failing to implement a reasonable cybersecurity incident response plan that would have enabled Defendant to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so they could take appropriate steps to mitigate the potential for identity theft and other damages.

89. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members.

90. Defendant's violation of the FTC Act also constitutes negligence *per se*, as it was, in part, designed to protect individuals like Plaintiff and the proposed Class Members from the harms associated with data breaches, including the severe invasion of their privacy.

91. Defendant has admitted that the PII of Plaintiff and Class Members was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

92. But for Defendant's wrongful and negligent breaches of duties owed to Plaintiff and Class Members, the PII of Plaintiff and Class Members would not have been compromised.

93. There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and Class Members and the harm, or risk of imminent harm, suffered by Plaintiff and Class Members. The PII of Plaintiff and Class Members

was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

94. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (iv) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) experiencing an increase in spam calls, texts, and/or emails; (vi) statutory damages; (vii) nominal damages; and (viii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

95. Plaintiff and Class Members are therefore entitled to damages, including restitution and unjust enrichment, and attorneys' fees, costs, and expenses.

96. Given Defendant's failures to implement the proper systems, as defined above, even knowing the ubiquity of the threat of data breaches, Defendant's decision not to invest enough resources in its cyber defenses amounts to gross negligence.

## COUNT II
## UNJUST ENRICHMENT
## (On Behalf of Plaintiff and the Class)

97. Plaintiff incorporates the above allegations as if fully set forth herein.

98. This claim is pleaded in the alternative.

99. Plaintiff and Class Members conferred a benefit upon Defendant in the form of PII provided to Defendant as a condition of receiving insurance services.

100. Defendant appreciated or had knowledge of the benefits conferred upon them by Plaintiff and Class Members.

101. Because of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between the value of services with reasonable data privacy and security practices and procedures, and the services without unreasonable data privacy and security practices and procedures that they received.

102. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information while profiting from Defendant's use and storage of that same data. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant calculated to increase its own profits at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own pocket.

103. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiff's and the proposed Class Members' PII because Defendant failed to adequately protect their PII. Plaintiff and the Class Members would not have provided their PII, had they known Defendant would not adequately protect their PII.

104. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it because of their misconduct and the Data Breach alleged herein.

**COUNT III**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class)**

105. Plaintiff incorporates the above allegations as if fully set forth herein.

106. Plaintiff and Class Members took reasonable and appropriate steps to keep their PII

confidential from the public.

107. Plaintiff's and Class Members' efforts to safeguard their own PII were successful, as their PII was not known to the public prior to the Data Breach.

108. Plaintiff and Class Members had a legitimate expectation of privacy to their PII and were entitled to the protection of this information against disclosure to unauthorized third parties.

109. Defendant owed a duty to its clients, including Plaintiff and the proposed Class Members, to keep their PII confidential.

110. The unauthorized release of PII, especially Social Security numbers, is highly offensive to any reasonable person.

111. Plaintiff's and Class Members' PII is not of legitimate concern to the public.

112. Defendant knew or should have known that Plaintiff's and Class Members' PII was private.

113. Defendant publicized Plaintiff's and Class Members' PII, by communicating it to cybercriminals who had no legitimate interest in this PII and who had the express purpose of monetizing that information by injecting it into the illicit stream of commerce flowing through the dark web and other malicious channels of communication (e.g., Telegram and Signal).

114. It is therefore highly likely that the Plaintiff's and the Class Members' PII is rapidly becoming public knowledge–among the community writ large–due to the nature of the malware attack that procured it, and the identity theft that it is designed for.

115. Moreover, because of the ubiquitous nature of data breaches, Defendant was substantially certain that a failure to protect PII would lead to its disclosure to unauthorized third parties, including the thousands of waiting identity thieves who are in a special relationship to Plaintiff and the proposed Class Members—in that those identity thieves are precisely the

individuals whose aim it is to misuse such PII.

116. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class members' privacy by Defendant.

**COUNT IV**
**THIRD-PARTY BENEFICIARY**
**(On Behalf of Plaintiff and the Class)**

117. Plaintiff incorporates the above allegations as if fully set forth herein.

118. Plaintiff and Class Members provided their information to their employers, as a condition of receiving insurance services.

119. Defendant entered into various contracts with its clients to provide benefits administration and other services. As a material part of those contracts Defendant agreed to implement reasonable data security practices and procedures sufficient to safeguard the Personal Information provided to it by its clients.

120. Upon information and belief, these contracts are virtually identical to each other and the provisions regarding PII were made expressly for the benefit of Plaintiff and the Class, as it was their confidential information that Defendant agreed to collect and protect through its services.

121. Thus, the benefit of collection and protection of the Personal Information belonging to Plaintiff and the Class were the direct and primary objective of the contracting parties.

122. Defendant knew that if it were to breach these contracts with its clients, the

employees, including Plaintiff and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

123. Defendant breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' Personal Information.

124. As a reasonably foreseeable result of the breach, Plaintiff and the Class were harmed by VeriSource' failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm sustained from the loss of their Personal Information to cybercriminals.

125. Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

**PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiff, on behalf of himself and all Class Members, requests judgment against Defendant and that the Court grant the following:

A. For an Order certifying this action as a class action and appointing Plaintiff and his counsel to represent the Class;

B. For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' PII, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

C. For injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i. prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii. requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;

iii. requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv. requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

v. prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vi. requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii. requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii. requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix. requiring Defendant to conduct regular database scanning and securing checks;

x. requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xi. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically

testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv. requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xv. for a period of 7 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D. For an award of actual damages, compensatory damages, and nominal damages, in an amount to be determined, and for punitive damages, as allowable by law;

E. For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

F. Pre- and post-judgment interest on any amounts awarded; and

G. Such other and further relief as this court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: May 1, 2025

Respectfully submitted,

*/s/ W. Michael Moreland*
W. Michael Moreland
*Attorney-in-Charge*
Texas Bar No. 24051080
**Clark, Love & Hutson, PLLC**
400 Louisiana St., Ste. 1700
Houston, Texas 77002
Telephone: 713-757-1400
mmoreland@triallawfirm.com

J. Gerard Stranch, IV*
Grayson Wells*
**STRANCH, JENNINGS & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

* Pro Hac Vice Forthcoming

***Counsel for Plaintiff and the Proposed Class***